# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

FACEBOOK IDENTIFICATION (UID)
100013929930536
FACEBOOK NAME
Marquel Johnson

) ) ) ) )

Case No. 18-906 M (N)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

■ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Sections 1951(a) and 2 (Hobbs Act Robbery), and Title 18, United States Code, Sections 924(c) and 2 (use of a firearm during a crime of violence).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI Special Agent David Kowalski
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: September 5, 2018

*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable Nancy Joseph , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, David Kowalski, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION, BACKGROUND, TRAINING, AND EXPERIENCE

1.      I am a Special Agent with the Federal Bureau of Investigation and have been so employed since April 2009. Since August 2018, I have been assigned to the Milwaukee FBI Violent Crime Task Force. I have participated in numerous complex narcotics, money laundering, violent crime, armed bank robbery, and armed commercial robbery investigations in violation of Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 924(c), 1951, 1956, 1957, 2113, and other related offenses. I have employed a wide variety of investigative techniques in these and other investigations, including but not limited to, the use of informants, wiretaps, cooperating defendants, recorded communications, search warrants, surveillance, interrogations, public records, DNA collection, and traffic stops. I have also received formal training regarding the same.

2.      I have conducted and/or assisted with investigations of violent crime and narcotics violations in conjunction with agents and officers from other jurisdictions, and have received training from these agents and officers in conducting these investigations. I have also conducted and/or assisted with investigations that have led to the arrest of persons for violations of law dealing with commercial robberies.

3.      This affidavit is based upon my personal knowledge, my training and experience, and on information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon police reports, official records, citizen witnesses' statements, consent searches, recorded statements, law enforcement surveillance, surveillance video, social media, court records,

telephone records, and public records which I consider to be reliable as set forth herein. The facts of this Affidavit are based upon information obtained from my investigation, as well as information I have received from other law enforcement officers.

4.      Based on the investigation to date, I submit that there is probable cause to believe that Nickie M. Foster (DOB XX/XX/1995), Marquel L. Johnson (DOB XX/XX/1994), and Martell D. Ford (DOB XX/XX/1990) conspired to commit and committed a series of armed robberies and attempted armed robberies in Milwaukee, Wisconsin, between August 22, 2018, and August 25, 2018, in violation of Title 18, United States Code, Sections 1951(a) and 2 (Hobbs Act robbery), and 924(c) and 2 (use, brandishing, and discharge of a firearm during a crime of violence).

5.      This affidavit is submitted in support of an application for a search warrant for Marquel Johnson's Facebook account, for evidence of Johnson's and others' involvement in armed robberies, in violation of Title 18, United States Code, Sections 1951(a), 924(c), and 2 between August 22, 2018, and August 25, 2018.

6.      More specifically, I seek authorization to search Facebook's information associated with Marquel Johnson (DOB XX/XX/1994), who is the user associated with the Facebook account with the following user name and ID number:

| FACEBOOK NAME | FACEBOOK IDENTIFICATION (UID) |
|---------------|-------------------------------|
| Marquel Johnson | 100013929930536 |

7.      The information I seek is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California, from at least approximately August 1, 2018, to the present.

8.      Because this affidavit is submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation. I have

2

attempted to set forth only the facts I believe are pertinent to establishing the necessary foundation for the warrant.

## II.    PROBABLE CAUSE

9.    I am involved in the investigation of a series of armed robberies of taxi cab drivers and gas station employees in the Milwaukee area between at least August 22, 2018 and  August 25, 2018.  The taxi cab companies and gas stations included in this affidavit are businesses involved in interstate commerce, and the below-described robberies affected interstate commerce.

**Armed Robbery of Taxi Cab Driver –August 22, 2018 (12:49 p.m.)**

10.    In the early afternoon on August 22, 2018, an individual using telephone number 414-242-3325, contacted United Blue Taxi and requested a pickup for an individual by the name of, "Scoobby [sic]" at 1014 S. 4th Street, Milwaukee, Wisconsin.  Shortly thereafter, A.S., a taxi cab driver for United Blue Taxi, arrived at this address.  At approximately 12:49 p.m., a black female (Subject #1) entered the rear passenger seat of A.S.'s cab and requested to be taken to the area of S. 14th and W. Washington Streets in Milwaukee, Wisconsin.  Upon arriving at this destination, A.S. requested payment for the fare.  Subject #1 then produced a silver semi-automatic handgun and pointed it at A.S.'s face and temple while demanding money from A.S.  Subject #1 then told A.S., "You have two minutes, give me the stuff!"  A.S. gave Subject #1 his wallet. Subject #1 then exited A.S.'s vehicle and entered a tan sedan, which was driven by another individual.  As Subject #1 was exiting A.S.'s vehicle, Subject #1 dropped a black wallet containing a State of Wisconsin Identification card bearing the name Nickie M. Foster (Foster), with date of birth XX/XX/1995.  The wallet also contained a Wisconsin Quest card and a Forward Health Insurance card, both bearing Foster's name.  Several debit cards with names other than Foster's were also located within the wallet.

11.    When interviewed by responding officers, A.S. stated that he believed he was

3

robbed by a black male; however, a review of the video recording device inside A.S.'s United Blue Taxi cab from the time of this incident shows Suspect #1's physical appearance to be consistent with the photographs of Foster maintained in various law enforcement/government databases. A.S. also stated that the handgun brandished during the robbery was black or brown; however, it is clear in the surveillance footage that the handgun was silver in color.

**Armed Robbery of Taxi Cab Driver -- August 22, 2018 (6:09 p.m.)**

12.     In the early evening on August 22, 2018, an individual using telephone number 414-242-3325 contacted American United, a Milwaukee, Wisconsin-based taxi company, and requested a pickup for an individual by the name of, "Scooby" at 715 S. 34th Street, Milwaukee, Wisconsin. Shortly thereafter, R.M., a taxi cab driver for American United, arrived at this address. At approximately 6:09 p.m., a subject entered the rear passenger seat of R.M.'s cab and directed him to start driving. After driving a few car lengths, the subject produced a silver handgun and ordered R.M. to pull over and throw his keys out of the window. R.M. complied and was then ordered to look away and turn over his property. R.M. gave the subject his cellular telephone and his wallet, which included his identification, approximately $570, and his debit card. The subject then exited R.M.'s vehicle and got into a bronze or orange car with rear end damage, which was parked nearby, and drove away.

13.     When interviewed by responding officers, R.M. stated that he was unsure if he was robbed by a black male or female. A review of the video recording device inside R.M.'s American United cab from the time of this incident does not provide a clear view of the subject's face; however, the clothing worn by the subject, the style of the subject's hair, and the handgun brandished are consistent with Foster's appearance in the earlier United Blue Taxi robbery.

**Armed Robbery of Taxi Cab Driver -- August 22, 2018 (9:38 p.m.)**

14.     In the late evening on August 22, 2018, a female caller contacted M.B., a taxi cab

4

driver for American United, on M.B.'s work phone, and asked to be picked up at 1515 S. 5th Street, Milwaukee, Wisconsin. M.B. agreed and drove to the location, arriving at approximately 9:38 p.m. Upon arrival, M.B. encountered his black female passenger (Subject #1) standing on the side of the road. Subject #1 asked M.B. if she could sit in the front, but he directed her to sit in the back. Subject #1 entered the rear passenger seat and immediately produced a silver handgun. Subject #1 told M.B. not to turn around and threatened to shoot him if he did. Subject #1 demanded M.B.'s money and M.B. complied. While M.B. was giving his money to Subject #1, a black male (Subject #2) entered the front passenger door and began searching M.B.'s person for additional valuables. Subject #2 took M.B.'s cellular telephone and Subject #1 and Subject #2 took cash from M.B. At some time during the robbery, Subject #1 struck M.B. in the head with the pistol. Subject #1 and Subject #2 then exited M.B.'s vehicle and got into a tan Pontiac sedan.

15. I have compared the surveillance footage with a known photo of Martell Ford. Subject #2's face and physical characteristics appear consistent in all respects with Ford.

16. A review of the video recording device inside M.B.'s American United cab from the time of this incident show's Subject #1 wearing similar clothing and carrying the same handgun used by the female subject, identified as Foster, in the two previous robberies. This video also shows a distinctive tattoo on Subject #1's right upper arm.

**Attempted Armed Robbery Outside of Petro Mart – August 22, 2018 (10:30 p.m.)**

17. At approximately 10:30 p.m. on August 22, 2018, while walking to the Petro Mart gas station located at 2341 S. Chase Avenue, Milwaukee, Wisconsin, A.G. was confronted by a black female (Suspect #3) wearing a grey sweatshirt with a hood over her head. Suspect #3 produced a handgun, which she pointed at A.G.'s face, and demanded money. A.G. stated he did not have any money, at which point Suspect #3 pulled the trigger of the gun twice but it did not fire. A.G. attempted to wrestle the gun away from Suspect #3 and both individuals fell to the

5

ground. While on the ground, a black male exited a tan sedan and began coming towards A.G. and Suspect #3. A.G. then pushed Suspect #3 and fled into the store. When A.G. and the Petro Mart attendant looked outside a short while later, Suspect #3 and the black male were gone.

**Armed Robbery of Taxi Cab Driver – August 23, 2018 (1:30 a.m.)**

18.　　At approximately 1:14 a.m. on August 23, 2018, an individual using telephone number 414-242-3325 contacted All-City Veterans Taxi and requested a pickup for an individual by the name of "Unique" at 4200 N. Holston Street, Milwaukee, Wisconsin. Shortly thereafter, J.M., a taxi cab driver for All-City Veterans Taxi, received an order on his in-board computer to complete the pickup, which he accepted at approximately 1:05 a.m. At approximately 1:28 a.m., J.M. arrived at the address, which was a daycare facility that appeared closed. After waiting for about five minutes, J.M. was approached by a black female, who J.M. to be in her late teens, between 5'0" and 5'2" tall, weighing approximately 120 pounds, and wearing an orange hooded sweatshirt and tan shorts. The woman, who identified herself as, "Tony Unique," (Unique) entered J.M.'s cab and requested to go to the intersection of 6th and Chambers Streets in Milwaukee, Wisconsin. Upon nearing the destination, Unique asked to be dropped off in the alley between 6th and 7th Street on Chamber Street. J.M. told her that he would not drop her off in the alley and parked in front of 618 W. Chambers Street. As J.M. was waiting to be paid his fare, Unique produced a silver handgun, put the gun to J.M.'s head, and then ordered him to put his head on the steering wheel. Unique then told J.M., "I'll kill you on the spot" and demanded his wallet and cellular telephone. Unique hit J.M. in the back of the head with the handgun and then directed him to turn off the car and throw the keys out the window. J.M. did as he was instructed and then gave Unique his cellular telephone and his wallet with approximately $30 in cash, several debit cards, and his identification card.

19.　　After receiving the property, Unique told J.M. not to turn around for five minutes

6

and then exited the vehicle. Shortly thereafter, J.M. exited the vehicle to get his keys. When he did, he observed Unique standing at the entrance to the nearby alley with the gun in her hand. Unique then pointed the gun at him and fired one shot, which J.M. stated sounded like it was a low caliber round because it was not very loud. After firing the shot, Unique ran north through the alley. J.M. grabbed his keys and immediately drove to the local police station to report the incident.

20. Upon receiving this report, law enforcement officers travelled to the area near 618 W. Chambers Street and attempted to locate a shell casing that evening, but were unable to do so due to the poor lighting conditions. Officers returned to the scene on the morning of August 23, 2018, and located one .22 caliber shell casing in the area near where J.M. stated Unique was standing.

**Petro Mart Gas Station Armed Robbery – August 23, 2018 (2:30 a.m.)**

21. At approximately 2:30 a.m. on August 23, 2018, two female subjects entered the Petro Mart gas station located at 2341 S. Chase Avenue, Milwaukee, Wisconsin. The first subject (Subject #1) was wearing the same cut-off tan shorts from the taxi cab robberies in the preceding 24 hours and was wearing blue gym shoes. Subject #1's physical features were in all respects consistent with Foster. The other subject (Subject #3) was wearing a grey hooded sweatshirt with the hood up, similar to the one described by A.G. in the attempted robbery at the same Petro Mart just a few hours earlier, as described above. As Subject #3 entered the gas station, Subject #3 removed a bottle of automotive fluid from a store shelf and used it to prop open the front door to the store. Based on my training and experience, I know that individuals who plan to commit robberies of commercial stores frequently try to defeat the remote controlled magnetic locks on stores by propping the door open or by having a co-actor hold it open.

22. Subject #1 then approached the store attendant, M.B., produced a silver handgun,

7

and shot M.B. in the head. After shooting him, Subject #1 stepped over M.B., who had fallen to the ground, and walked to the cash register, which was in a glass-enclosed area. Subject #1 opened the register and took the cash contained within. As she collected the money, Subject #1 passed the silver handgun through an opening in the cash register area to Subject #3, who took possession of the weapon and subsequently pointed it at M.B., who was still on the ground. At approximately 2:30 a.m., Subject #1 and Suspect #3 exited the store. M.B. survived the shooting, but requires ongoing medical care and continues to endure significant cognitive impairments from the shooting. The bullet remains in M.B.'s head and cannot be surgically removed.

23.     The surveillance footage showed the activity described above. One camera view showed Subject #1 holding the silver pistol in her outstretched right hand. In the footage, the outlines of two tattoos are visible on Subject #1's right arm. Two consistent tattoos are visible on Subject #1's right arm in the footage for the robbery of taxi cab driver M.B. on August 22, 2018, at approximately 9:38 p.m., just a few hours before the Petro Mart robbery. In addition, the Petro Mart surveillance footage shows that Subject #1 was wearing cut-off shorts. Subject #1's shorts appear consistent with Subject #1's shorts from the surveillance footage of the robbery of taxi cab driver R.M. on August 22, 2018, at 6:09 p.m.

**Recovery of Suspect Vehicle – August 23, 2018 (5:59 p.m.)**

24.     On August 23, 2018, at approximately 5:59 p.m., law enforcement officers located a 2000 Pontiac Grand Am, gold in color, bearing Wisconsin license plate: 549-TAH, with VIN: 1G2NF52T6YM864942, which matched the description of the subject vehicle used in several of the aforementioned robberies. The vehicle, which had all of the windows broken out, was parked on the road near 2268 S. 17th Street, approximately one mile from the Petro Mart described above. During a search of the vehicle, law enforcement officers recovered a number of items, including the following:

8

a. a Wisconsin Driver's License bearing the name of A.S., one of the taxi cab robbery victims;

b. a Wisconsin Driver's License bearing the name of M.B., one of the taxi cab robbery victims;

c. a City of Milwaukee Driver's License bearing the name R.M., one of the taxi cab robbery victims; and

d. blue Nike shoes consistent with those worn by Subject #1 (Foster) during the Petro Mart robbery that had occurred less than 16 hours earlier.

25.    While searching the vehicle, officers also recovered two cards listed to Marquel Johnson (Johnson): a Wisconsin Quest card and a Potawatomi Fire Keeper's Card. In addition, officers recovered a prescription inhaler for Johnson that was filled at Walgreens pharmacy at 2410 West Forest Home Avenue on the south side of Milwaukee. Subsequent queries of various law enforcement databases produced several photographs of Johnson matching the physical description of Subject #3 in the robberies above. Law enforcement also queried Facebook.com for the name, "Marquel Johnson," which returned the account: https://www.facebook.com/marquel.johnson.3956. The Facebook User ID associated with this account is: 100013929930536. A review of the publicly viewable postings associated with this account revealed multiple pictures matching the physical description of Subject #3 in the robbery outside Petro Mart and robbery of Petro Mart on August 22 and August 23, respectively, as well as the known photographs of Johnson, which were previously located in the various law enforcement databases.

26.    The following photograph was observed on Johnson's Facebook account with a post date of August 19, 2018:

9



Based on my training and experience, I know the term "22" in the above photograph is a reference to .22 caliber, which is the same size ammunition recovered from the robbery of taxi-cab driver J.M. in the early morning hours of August 23, 2018. The handgun in this photograph is consistent with the silver handgun used in each of the above-described robberies, including the one that Subject #1 used to shoot the Petro Mart gas station employee in the head.

**BP Gas Station Robbery – August 25, 2018 (3:43 a.m.)**

27. At approximately 3:43 a.m. on August 25, 2018, a female suspect (Subject #3) and a male suspect (Subject #2) exited a newer, dark-colored Chevrolet Malibu, which was parked on W. Buffalo Street and walked into the BP Welcome Mart located at 350 N. Plankinton Avenue, Milwaukee, Wisconsin. Shortly thereafter, Subject #2 moved to the entry door and propped it open. At approximately the same time, Subject #3 who had moved to the cashier's counter,

10

produced a silver handgun, and demanded money from the cashier, who was located behind ballistic-proof glass. The cashier refused to comply and when Suspect #2 exited the gas station and let the entry door close, the cashier activated the door lock, locking Subject #3 inside. Upon observing this, Suspect #2 attempted to open the door from the outside, and when he could not, he returned to the Chevrolet Malibu and drove away. The surveillance footage showed a distinct mud pattern on the passenger side of the dark-color Malibu.

28.     At multiple points during the surveillance footage, the female suspect's face is visible and I can identify the female suspect as Johnson. In addition, the female suspect is wearing what appears to be the same Nike flip-flops as those worn by Subject #3 in the Petro Mart robbery. The male suspect's face is also visible at certain points in the footage, and he appears consistent with Martell Ford.

29.     Johnson, who remained inside the gas station, continued to threaten the cashier while attempting to open the door. Johnson eventually located another exit door which she was able to open, and fled the scene. Neither Johnson nor Subject #3 obtained any property during this attempted robbery.

30.     Later in the day on August 25, 2018, law enforcement officers observed Johnson driving a blue Chevrolet Malibu, bearing Illinois license plate: E62-3921, with vehicle identification number (VIN): 1G1ZC5E10BF370094, which had a distinct mud pattern on the passenger side, consistent with the vehicle observed during the BP Gas Station robbery earlier that day. When officers attempted to conduct a traffic stop, Johnson fled the scene and a high-speed pursuit was initiated. While attempting to evade law enforcement, Johnson struck two bystander vehicles, ultimately disabling her vehicle as a result of her collision with the second vehicle. Johnson was taken into custody and subsequently transported to a medical facility for treatment of injuries sustained during the crash. During the search of Johnson's person incident to arrest,

11

officers recovered a loaded silver .22 caliber handgun from Johnson's pocket. The firearm is consistent in all respects to the firearm in Johnson's Facebook post from August 19, 2018, and the firearm brandished and discharged during the robberies. One unique feature of the firearm was black duct tape on the handle area, which is visible in some of the taxi cab surveillance footage from the robberies.

31.    On or about August 20, 2018, a blue Chevrolet Malibu, bearing Illinois license plate: E62-3921, with vehicle identification number (VIN): 1G1ZC5E10BF370094, was reported stolen from O'Hare Airport in Chicago, IL. A review of Johnson's Facebook records shows a wall post on August 19, 2018, at 7:41 p.m. that reads, "In the city Chicago bound." Then, on August 20, 2018, at 6:45 p.m., a selfie-style photograph of Johnson was posted to the Facebook page with the post "Came to the city to slap . . . one more night an on my way back to mil (with emoticons)." In the photo, Johnson appears to be in a public restroom and has a stack of U.S. currency under her chin.

32.    On August 23, 2018, at 3:35 a.m., just over an hour after the Petro Mart robbery in which the gas station employee was shot in the head, the following post was added to Johnson's Facebook page:

Case 2:18-mj-00906-NJ    Filed 04/27/20    Page 13 of 26    Document 1



Marquel Johnson
August 23 at 3:35 AM · 🌐

Tryna run it u niggas in the way

👍❤ 4

33.     In addition, Marquel Johnson's Facebook page shows a photo posted on August 24, 2018, at 12:17 a.m., in which she is in what appears to be a hospital with a breathing apparatus, such as a nebulizer, attached to her face. The post reads, "asthma (with various emoticons)."

34.     After receiving medical treatment following her arrest on August 25, 2018, Johnson was interviewed by law enforcement while in the hospital. During this interview, Johnson acknowledged her role in at least two of the robberies detailed above: the robbery of Petro Mart; and the BP gas station robbery. Johnson stated Martell Ford was the male suspect in the robberies.

13

Johnson stated she was with Nickie Foster and Martell Ford at the Petro Mart robbery. Johnson stated Foster had the gun and shot the clerk, then handed the gun to Johnson while Foster gathered the money. Johnson stated that on August 25, 2018, she and Ford entered the BP gas station on N. Plankinton. Johnson admitted to having the gun. Johnson also confirmed Foster's involvement in the taxi-cab robbery of M.B.

35. Queries of various law enforcement databases revealed photographs of Ford consistent with the surveillance photos obtained during the relevant robberies involving Subject #2.

36. On September 3, 2018, law enforcement officers conducted a custodial interview of Foster following her arrest. During that interview, Foster, after waiving her Miranda rights, acknowledged her involvement in the four taxi cab robberies, detailed above, which took place on August 22 and 23, 2018. Foster stated that Johnson drove her to and picked her up from each of these robberies. Foster was shown a prior booking photo of Ford and subsequently identified him as the male subject involved in the robbery of B.M. According to Foster, Ford was involved in a total of two or three of the taxi cab robberies.

37. During her interview, Foster also acknowledged her involvement in the Petro Mart robbery, which according to Foster, was Johnson's idea. Specifically, Foster recalled Johnson giving Foster the .22 caliber pistol and directing her to point it at the clerk. While Foster was doing this, Johnson locked the door to the store as Ford waited outside in the vehicle. Foster knew the clerk was shot, but she was not sure how it happened because her finger was not on the trigger when she pointed it at him. After collecting the money, Foster, Johnson, and Ford all left the scene together. Foster was shown a photo of the handgun recovered from Johnson at the time of her arrest and confirmed it was the same one used in each of the robberies.

## III.    FACEBOOK INFORMATION

38.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

39.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

40.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

41.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

15

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

42.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically he visihle to anyone who can view the user's profile.

43.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

44.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facehook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In

16

addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

45.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

46.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

47.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

48.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

49.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

50.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are

17

free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

51.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

52.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

53.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

54.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

18

55.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

56.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

57.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be

19

evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

58.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## IV.     INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

59.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information

20

(including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment.

## V.    CONCLUSION

60.    Based upon the facts contained within this affidavit, I believe that probable cause exists to search Marquel Johnson's Facebook Account for further evidence of her and others' involvement in the armed Hobbs Act robberies and attempted robberies and other criminal incidents described above.

## ATTACHMENT A

*Property to Be Searched*

To the extent that the information described in Attachment B is within the possession, custody, or control of Facebook, Facehook is required to disclose to the government the information, for the dates of August 1, 2018, to the present, for the following account:

| FACEBOOK NAME | FACEBOOK IDENTIFICATION (UID) |
|---|---|
| Marquel Johnson | 100013929930536 |

## ATTACHMENT B

## Particular Things to be Seized

### I.     Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a.     All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b.     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c.     All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

d.     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

23

e.   All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f.   All "check ins" and other location information;

g.   All IP logs, including all records of the IP addresses that logged into the account;

h.   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.   All information about the Facebook pages that the account is or was a "fan" of;

j.   All past and present lists of friends created by the account;

k.   All records of Facebook searches performed by the account;

l.   All information about the user's access and use of Facebook Marketplace;

m.   The types of service utilized by the user;

n.   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o.   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p.   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1951(a) (Hobbs Act robbery) and 18 U.S.C. 924(c)

24

(use of firearm during a crime of violence), since August 1, 2018, for the user ID identified on Attachment A, information pertaining to the following matters:

    (a) The relevant offense conduct, any preparatory steps taken in furtherance of the criminal scheme, and communications between Marquel Johnson and others related to the relevant offense conduct of robbery or attempted robbery or Marquel Johnson's possession of a firearm.

    (b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

    (c) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

    (d) The identity of the person(s) who created or used the user ID; and

    (e) The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of robbery.